## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-178-APM** |
| **SHELLY STALLINGS,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Shelly Stallings to fifty-one months' incarceration, three years of supervised release, $2,000 in restitution, a fine, and the mandatory $100 special assessment for each count of conviction.

### I.      INTRODUCTION

The defendant, Shelly Stallings, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Stallings, a forklift operator and Kentucky resident, was part of the mob of rioters who confronted police officers on the Lower West Terrace (LWT) of the U.S. Capitol building. Together with her husband and codefendant Peter Schwartz, she used a large canister of pepper spray to spray police officers who were fending off rioters on the LWT at around 2:30 p.m.  At around this time, the police line on the LWT collapsed, with police retreating to a tunnel (LWT Tunnel) that led to an entryway into the building.  Rioters then invaded the LWT Tunnel.  Shortly after 3:00 p.m., Stallings entered the LWT Tunnel and walked to the front of the rioters who were engaged in a coordinated push against the line of Metropolitan Police Department (MPD) officers. She appears to have taken part in the pushing. She left the LWT Tunnel after several minutes. During interviews with law enforcement officials after January 6, Stallings was not forthcoming about her conduct that day.

The government recommends that the Court sentence Stallings to fifty-one months' incarceration, which is within the advisory Guidelines' range of 46 to 57 months, which the government submits is the correct Guidelines calculation. A 51-month sentence reflects the gravity of Stallings's conduct, but also acknowledges her admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

Paragraphs 20 through 26 of the presentence report (PSR) succinctly describe the violent assault on the United States Capitol building that took place on January 6, 2021, when many hundreds of rioters unlawfully broke into that building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene

that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property.

### Attempted Breach of the Capitol Building and Assaultive Conduct in LWT Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6[th] Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building on the LWT.   The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That LWT Tunnel led to two sets of metal swinging doors inset with glass.  On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the LWT Tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Image 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the United States Capitol Police (USCP), assisted by MPD officers,were arrayed inside the doorway and guarding the entrance.  Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.  The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles and

other items.  Officers created a line in the doorway to block the rioters and physically engaged

them with batons and OC spray.  At a later hearing on the events of January 6, Congressman

Stephanie Murphy described her experience nearby this location in response to testimony from

MPD Officer Daniel Hodges, who was assaulted while caught in the LWT Tunnel doors between

the two forces:

> January 6[th] was an attack on our democracy, it was an attack on the peaceful transfer
> of power, and it was an attack on this Capitol building, but it was also an attack on
> real people.  And most people don't know this -- and I don't think even you know
> this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January
> 6th, 2021, while you were holding back the mob at the Lower West Terrace
> entrance, I was holed up with Congresswoman Kathleen Rice in a small office
> about 40 paces from the tunnel that you all were in.  That's about from the distance
> where I'm sitting here on the dais to that back wall.  And from that office in close
> proximity to where you all held the line, I listened to you struggle.  I listened to you
> yelling out to one another.  I listened to you care for one another, directing people
> back to the makeshift eyewash station that was at the end of our hall.  And then, I
> listened to people coughing, having difficulty breathing, but I watched you and
> heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD
> Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before
> the House Select Comm. to Investigate the January 6[th] Attack on the United States
> Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available
> at   https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-
> attack.

The violent and physical battle for control over the LWT entrance in the LWT Tunnel and

doorway area continued for over two hours, during which time rioters repeatedly assaulted,

threatened, pushed, and beat police officers.  The battle for the LWT entrance involved intense

hand-to-hand combat, and some of the most violent acts against police, including the abduction

and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer

Daniel Hodges.

### B.     Defendant's Role in the January 6, 2021 Attack on the Capitol

The defendant, Shelly Stallings, lives in Morganfield, Kentucky.  On the morning of

January 6, 2021, Stallings traveled from Uniontown, Pennsylvania (where she was residing at the time) to Washington, D.C., via automobile with her codefendant and then husband, Peter Schwartz. Stallings made the trip to protest Congress' certification of the Electoral College.  After arriving in D.C., Stallings and Schwartz attended the "Stop the Steal" rally and then marched with other protestors to the Capitol.  They arrived at the Capitol at around 2:00PM.

After arrival, they witnessed police officers defending the Capitol building, using oleoresin capsicum ("OC spray") and tear gas.

At about 2:30PM, Stallings and Schwartz were a part of a group that had gathered on the LWT.  As Stallings later told FBI agents, Schwartz threw a metal folding chair at police officers, hitting as many as seven of them – this is corroborated by footage from bodyworn cameras. That allowed Schwartz to grab a duffel bag of three or four fire-extinguisher-sized canisters of pepper spray, which he repeatedly used against the officers – his actions spraying police officers on the LWT are also corroborated by video footage. Schwartz also struck an officer in the head with a baton that Stallings referred to as a "tire thumper" when speaking to the FBI agent. The government has been unable to corroborate this aspect of Stallings's account, although video footage shows Schwartz holding the "tire thumper."

Stallings observed Schwartz direct pepper spray toward police officers who were trying to protect the grounds and building from rioters. At one point, Schwartz then handed Stallings the can of pepper spray, and she directed the aerosol at those police officers.  The USCP and MPD officers were in full uniform and were clearly identifiable as police.  At no time did any of these officers attempt to assault Stallings and Stallings did not spray the officers in self-defense. A screenshot from open source, Image 2, below, shows Stallings spraying towards the officers:



**Image 2**

At some point after spraying the officers, shortly after 3:00PM, Stallings walked toward the LWT Tunnel with Schwartz and codefendant Jeffrey Brown.

Thereafter, Stallings entered the LWT Tunnel and made her way to the front of the line of rioters, all of whom began pushing against MPD and USCP officers who were guarding a door to the Capitol. As they pushed against the police line, they coordinated their thrust by yelling "heave ho" in unison. Stallings appeared to have participated in the thrust. While inside the LWT Tunnel, Stallings' codefendants, Schwartz, Brown, and Maly, coordinated to spray an orange substance at MPD officers inside. Stallings left the LWT Tunnel after more than five minutes, and appeared to yell something as she exited, right behind Schwartz, as shown below. Schwartz is circled in yellow.



**Image 3**

*Stallings' FBI Interviews*

Stallings was initially interviewed by the FBI on February 8, 2021, while agents were executing a search warrant for her residence and an arrest warrant for her husband, Peter Schwartz. Stallings acknowledged that she and Schwartz had gone to Washington, D.C. and attended the Stop the Steal rally, and that they had arrived at the Capitol around 2:00 p.m. that day.  She admitted that Schwartz had directed pepper spray once at the police, but that she believed it was in response to police throwing tear gas bombs at Stallings.  Stallings also stated that she believed the police were targeting Schwartz. She did not mention that she had also sprayed pepper spray at the police, or that Schwartz had thrown a chair at police, or that Schwartz had handed a cannister of pepper spray to another rioter in the LWT Tunnel where the rioter sprayed police. She acknowledged that she had posted statements on Facebook regarding things she had seen at the Capitol on January 6. Stallings also stated that two pistols that agents recovered from her residence belonged to her.

8

Between February 8 and June 28, 2021, Stallings contacted the FBI and requested to speak with an agent to provide more information about Schwartz.  On July 6, 2021, she spoke with agents for a second time. She stated that she was going to seek a divorce from Schwartz and wanted to correct her February 2021 statement to the FBI.  In particular, she admitted she had lied about the two pistols in her residence, which actually belonged to Schwartz.  She also admitted she had lied about Schwartz spraying officers only in response to her getting sprayed.  Finally, she admitted she had lied about the spraying because she hadn't wanted Schwartz to get charged with additional charges and that she was afraid for her own safety if she told the truth.  She reported that Schwartz had beaten her two days prior to his arrest and her initial interview with the FBI.

Stallings admitted seeing Schwartz throw a metal folding chair at officers, grab a duffel bag containing canisters of pepper spray, spray the officers, and strike an officer with the "tire thumper," in contradiction to her representation in her earlier FBI interview that Schwartz had not picked up any club-like item.

Stallings admitted to being in the LWT Tunnel and walking away after entering a couple of feet into it. She denied assaulting anyone but admitted to passing a can of pepper spray to Schwartz. Stallings discussed several courses of conduct by Schwartz that related to threatening or harming others, including herself, who reported him to law enforcement officials. She claimed that Schwartz had sent as many as 30 messages from jail threatening to kill her if she cooperated. Finally, she claimed that she had told Schwartz not to do something, or to stop doing something, while they were at the Capitol, and told the FBI agents she was willing to cooperate further in their investigation.

About a month after this second interview, Stallings voluntarily provided her electronic

items (laptop and desktop computers) to FBI agents so that they could investigate the threats she had alleged Schwartz made. No threats to kill were located on the computers, and the FBI returned her computer to her on July 22, 2021.

Finally, on January 28, 2022, the FBI reached out to Stallings to interview her again. The agents confronted her with photographs and video of her directing pepper spray at police officers, and she admitted that the person in the photos and video was her. She equivocated regarding the fact that she had lied to the FBI in her previous interviews, but at one point admitted that she had lied about spraying the officer because no one got hurt and she only directed the pepper spray for a second or two.

## III.    THE CHARGES AND PLEA

On August 24, 2022, Shelly Stallings pleaded guilty, without an agreement, to all the charges against her in the Second Superseding Indictment:

- Count Two, Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Six, Assaulting, resisting, or impeding certain officers with a deadly or dangerous weapon, 18 U.S.C. § 111(a)(1) and (b)(1);

- Count Nine, Entering or Remaining in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count Ten, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count Eleven, Engaging in Physical Violence in a Restricted Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count Twelve, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

- Count Thirteen, Act of Physical Violence in the Capitol Grounds, 40 U.S.C. § 5104(e)(2)(F).

10

## IV.    STATUTORY PENALTIES

Stallings now faces sentencing on these charges.  The U.S. Probation Office has correctly noted the statutory penalties for each.  PSR ¶¶132-135.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines calculations in the PSR are correct as far they go, but the PSR does not include certain required calculations. In particular, the PSR does not include a Guidelines analysis for each count to which Stallings pleaded guilty. *See* PSR ¶¶ 44-68. Sections 1B.1(a)(1)-(3) of the Guidelines describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶¶ 53-

11

55) that certain counts group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

Count Two: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |
| | **Total** | **24** |

Count Six: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. § 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |
| | **Total** | **26** |

Count Nine: 18 U.S.C. § 1752(a)(1) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| | **Total** | **18** |

Count Ten: 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| | **Total** | **18** |

Count Eleven: 18 U.S.C. § 1752(a)(4) and (b)(1)(A)

---

[2] By operation of U.S.S.G. § 2X5.1, and cross-reference from § 2A2.4.

[3] By cross-reference from U.S.S.G. § 2B2.3(c)(1), and then through operation of § 2X1.1(a).

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

12

| U.S.S.G. § 2A2.2(a) [5] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon used | +4 |
| U.S.S.G. § 3A1.2(a) | Official Victim | +6 |
| | **Total** | **24** |

The PSR correctly notes that Counts 2, 6, and 11 group because they involve the same victim (police officers), while Counts 9 and 10 group because they involve the same victim (Congress).  PSR ¶¶53-54.  But then these two groups combine with each other because the calculation for Counts 2, 6, and 11 embodies conduct (use of a dangerous weapon) that is treated as a specific offense characteristic in Counts 9 and 10.  *Id*. ¶55.

| **Combined Offense Level** | **26** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
| **Total Adjusted Offense Level:** | **23** |

The U.S. Probation Office calculated Stallings's criminal history as I, which the Government does not dispute.  PSR ¶ 75.  Accordingly, Stallings' Guidelines imprisonment range is 46 to 57 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities

---

[5] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

among defendants with similar records who have been found guilty of similar conduct, 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual who entered the Capitol grounds and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol grounds, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Stallings's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the

defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Stallings' crimes weigh heavily towards a significant term of incarceration. Stallings personally participated in violence that day by picking up a canister of pepper spray and shooting it at police officers. She did so after witnessing other rioters doing the same thing, understanding that these officers were greatly outnumbered and attempting to keep rioters from advancing any further into the building. She was in a particularly violent area of the riot – the LWT – where rioters like her husband, as she acknowledged, were not only spraying officers but throwing chairs at officers.

Even after spraying at officers and watching others do the same, Stallings continued to remain on the LWT, making her way to the LWT Tunnel. Inside the LWT Tunnel, rioters pushed against a line of police officers. The police officers were visibly engaged in standing off against rioters, in an attempt to keep them from advancing into the building. Yet Stallings not only entered the LWT Tunnel, but pushed to the very front, where she appeared to push against officers. As she exited the LWT Tunnel she appeared to be yelling something and did not appear remorseful.

Stallings's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to engage in violence. After the riot, she minimized and lied to FBI agents about what happened. In her first meeting with agents, she minimized her husband's and her own conduct. In her second meeting, she acknowledged more of her husband's conduct, but again, minimized her own. Finally, in her third interview with agents, and only after they confronted her with incriminating photos and video, did she admit to shooting officers with pepper spray.

15

Although she expressed willingness to cooperate with the government, her previous minimization and false statements to the agents severely damaged her effectiveness as a potential witness.  She also continues to minimize her conduct in the LWT Tunnel.

### B.  Stallings' History and Characteristics

Stallings has been employed as a forklift operator since July 2022. PSR ¶120.  Before that, she worked as a welder for several years.  *Id*. ¶122.  Stallings has prior convictions for theft and driving while impaired.  *Id*. ¶¶70-74.

Stallings's crimes on January 6 were not an isolated event in an otherwise law-abiding life, but her past offenses were not violent. Her history and characteristics do not weigh heavily one way or the other in relation to the question of the length of her term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Stallings's criminal conduct, assaulting a police officer, is the epitome of disrespect for the law. When Stallings entered the Capitol grounds, it was abundantly clear to her that the police officers protecting the building were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law

---

[6] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                                      at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Stallings also weighs toward

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

incarceration. Although Stallings has now expressed remorse and contrition, she had prior multiple opportunities to confess and accept responsibility for her crimes, and she not only failed to do so, but misled law enforcement officials about them. Her conduct after January 6, 2021 should be considered in weighing the need for specific deterrence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Stallings and others like her committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related

conduct in other cases. To try to mechanically compare other § 111 defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

In *United States v. Daniel Caldwell*, 1:21-cr-181-CKK, the defendant pleaded guilty to this violation, for spraying officers on the LWT of the Capitol with a chemical spray before entering the building. There, the United States requested 70 months' imprisonment and Judge Kollar-Kotelly sentenced Caldwell to 68 months' imprisonment. Caldwell's conduct was more severe than Stallings', given that, by his own account, he claims to have sprayed fifteen officers that day, and because he, unlike Stallings, entered the Capitol building.

In *United States v. Julian Khater*, 1:21-cr-222, the defendant pleaded guilty to this violation as well. Khater attacked multiple police officers with pepper spray outside of the Capitol, and, like Stallings, did not appear to have entered the building itself. There, the United States requested 90 months' imprisonment. Judge Hogan imposed a sentence of 80 months' imprisonment. Again, Khater's conduct was more severe than Stallings', given that the government established bodily injury to an officer and that Khater arrived in Washington, D.C. armed with pepper spray and bear spray.

Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C.

Cir. 2011).  Two general restitution statutes provide such authority.  First,  the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."  *Papagno*, 639 F.3d at 1096.  Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.  *Papagno*, 639 F.3d at 1096.  The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features.  Both require that restitution "be tied to the loss caused by the offense of conviction."  *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*).  Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[8]  *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.  *See Papagno*, 639 F.3d at 1097; § 3663(b); § 3663A(b).  Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926

---

[8] The government or a governmental entity can be a "victim" for purposes of both the VWPA and MVRA.  *United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012).

F.3d 761, 791 (D.C. Cir. 2019).  The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result.  *See Emor*, 850 F. Supp. 2d at 202.  The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[9]  *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects.  As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49.  18 U.S.C. § 3663(a).  In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."  *United States v. Williams*, 353

---

[9] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review."  *Fair*, 699 F.3d at 513.

F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).  By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Applying these principles to this case leads to the conclusion that Stallings should be required to pay $2,000 in restitution.

First, one of the offenses for which Stallings was convicted, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol.  *See* 18 U.S.C. § 3663A(c)(1)(A)(ii).  Moreover, Stallings's four additional convictions under Title 18 fall within the VWPA.  As the evidence at trial showed, Stallings's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol Building and grounds and losses suffered by police officers deployed to protect Members of Congress, their staff, and other Capitol employees.  A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Stallings should be responsible is $2,000.  That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664."  18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d).  Because this case essentially involves the related criminal conduct of hundreds of

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses.  18 U.S.C. § 3664(h).

Stallings's crimes on January 6 affected several entities responsible for the Capitol Building, among them the Architect of the Capitol, the Office of the Chief Administrative Officer of the United States House of Representatives, and the Office of the Secretary of the United States Senate.  The total amount of damages sustained by these entities, as mentioned above, is $2,881,360.20.

Here, Stallings should be directed to pay $2,000 as an approximate estimate of the losses for which she is responsible.  Her restitution payment should be made to the Clerk of the Court.

## VIII.   FINE

Stallings's conviction under Section 111 subjects her to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

The government is not recommending the imposition of a fine in this case.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 51 months, which is a mid-range sentence as calculated by the government and U.S. Probation, restitution of $2,000, a fine, and the mandatory $100 special assessment for each count of conviction.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052


By:_____/s/_____
     Cindy J. Cho
     Assistant United States Attorney
     Member of NY Bar
     U.S. Attorney's Office for the District of Columbia
     601 D Street NW
     Washington, D.C. 20530
     Phone: 317-229-2425
     Email: Cindy.Cho@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 23, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all parties listed on the Electronic Case Filing System.

By:     <u>/s/ Cindy J. Cho</u>
CINDY J. CHO
Assistant United States Attorney