**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-178-APM** |
| **PETER J. SCHWARTZ** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, respectfully submits this memorandum in connection with the sentencing of defendant Peter Schwartz.   As one of the most violent and aggressive participants in the January 6, 2021 attack on the United States Capitol, and as someone who has a long history of assaulting police officers and women, the government asks that the Court sentence defendant Schwartz to 294 months of incarceration, three years of supervised release, restitution in the amount of $2000, a fine of $71,541, and a mandatory assessment of $100 for each felony conviction and $10 for each Class B misdemeanor conviction. This sentence is at the midpoint of Schwartz's Sentencing Guidelines range and takes account of his repeated violence against police on January 6th, his substantial violent criminal history, his utter lack of remorse, and his efforts to profit from his crime.

## I.      INTRODUCTION

Defendant Schwartz – a welder by trade and a felon who has racked up numerous convictions for drugs, weapons, and violence over the last three decades – came to Washington D.C. on January 6, 2021 intent on violence.   Armed with a wooden tire knocker, Schwartz and his then-wife, Shelly Stallings, made their way to the thick of the violence and aggressively participated in the effort to overwhelm the police line on the Lower West Terrace (LWT).   It was

1

Schwartz who threw the "first" chair at the line of officers, creating an opening in the police line in the northwest corner of the terrace that enabled hundreds of rioters to flood the LWT as overwhelmed officers were forced to retreat.   He then stole chemical munitions, including pepper spray, that had been left behind by the fleeing officers and used that pepper spray as a weapon to attack those same officers as they desperately tried to escape the growing and increasingly violent mob.   He later made his way up to the inaugural stage and entered the tunnel, where a line of officers spent hours defending the tunnel entrance from a mob determined to force their way into the Capitol building.   While inside, Schwartz worked with codefendants Markus Maly and Jeffrey Brown to again spray the line of officers inside with pepper spray.   Schwartz did all this while on probation in at least one other case involving both assaultive conduct and illegal firearms possession.

The attack on the United States Capitol by Schwartz and others ultimately forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]   After leaving Capitol grounds, Schwartz bragged to multiple people about his participation in the violence that day.   In three different text messages to three different people, Schwartz boasted about how he had thrown the "first" chair at officers and gleefully described how he had stolen police munitions to use against them.   Even now, more than two years later, he has demonstrated zero remorse for his conduct,

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

giving repeated interviews from the D.C. Jail claiming that he is a completely innocent victim of a biased prosecution and has done nothing wrong.   For his conduct, the government recommends that the Court impose a sentence of 294 months, at the midpoint of Schwartz's sentencing guideline's range.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

Having presided over the trial in this and several other cases, this Court is well aware of the assault on the United States Capitol building and grounds by a mob of thousands of rioters on January 6, 2021.   During trial, the Court heard testimony regarding the joint session of Congress that was in progress on that date, the vote count of the Electoral College, as well as the initial breach of the Capitol by the mob and the consequences of that breach.   For additional background, the United States hereby incorporates by reference the trial testimony of U.S. Capitol Police Captain J.B.   *See* Trial Tr. 11/29/22 at 58-172.

### B.   Assaults on Police on the West Front and Tunnel

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd, including Schwartz, and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.   The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.

The breach of the West Front began at approximately 12:45 pm, when a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Within 15 minutes, members of the crowd overcame the manned and unmanned barriers along the walkway and began to advance toward the Capitol.   By 1:00 p.m., with the crowd already numbering in the hundreds, they then began flooding toward the Lower West Terrace at the base of the Capitol building.

For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, including defendant Schwartz.   As the police attempted to establish and reinforce a defense line, members of the crowd attempted to disrupt that effort by using fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry either brought by members of the crowd or seized from the inaugural stage construction site.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line.   One of those gaps occurred in the northwest corner of the terrace in the seconds after defendant Schwartz threw a chair at the line of officers, which distracted the officers as they scrambled out of the way of the flying chair.   The rioters then began to flood onto the Lower West Terrace from multiple

directions – including through the opening created by Schwartz – forcing the police to retreat. Rioters then seized control of the Lower West Terrace (LWT) and the inauguration stage.

Once the mob took over the LWT some of those rioters, including Schwartz and his codefendants Markus Maly and Jeffrey Brown, made their way up to the inauguration stage and attempted to enter the Capitol Building via the LWT "tunnel," which leads directly into the building.   The "tunnel," which was closed to the public by two sets of glass double doors, was the site of one of the most sustained and aggressive confrontations between rioters and police that day.

At approximately 2:42 pm, the mob broke the glass windows to the first set of double doors in the tunnel.   Police then reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist.   The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles and other items.   The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers.   The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police that day.

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.   Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 pm.   It is not an exaggeration to state that the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

**C.  Schwartz' Role in the January 6, 2021 Attack on the Capitol**

Peter Schwartz arrived at the United States Capitol armed with a wooden tire knocker and ready for violence.   After driving from Pennsylvania to Washington D.C., Schwartz and his then-wife, Shelly Stallings, attended the "Stop the Steal" rally at the Ellipse.   They both then made their way toward the Capitol building, stopping only once they had reached the northwest corner of the Lower West Terrace (LWT) where the growing and increasingly aggressive mob was in a standoff with the line of police officers there.   At 2:28 p.m., as the mob was already in a frenzy, Peter Schwartz threw a folding chair directly at the officers standing in the northwest corner of the terrace.   At the same time, a mass of other rioters surged forward toward the police and began to physically confront the officers on the line.



*Image 1:   MPD Officer D.P. pulls unknown USPC officer out of the way of the flying chair thrown by Schwartz*

The melee, including the flying chair, caused one unknown U.S. Capitol Police (USCP) officer to stumble, prompting Metropolitan Police Department (MPD) Officer D.P.[2] to reach out to pull that unknown officer out of harm's way.   By the time the chair landed on the ground, the line of officers in the northwest corner had broken, allowing numerous rioters to surge through the police line and onto the LWT in the ensuing moments.   See Gov't Sentencing Ex. 1 – Video of Chair Throw.   By throwing that chair, Schwartz directly contributed to the fall of the police line that enabled rioters to flood forward and take over the entire terrace.

Schwartz later bragged about throwing that chair in multiple text messages.   On January 6, 2021, he texted: "We are on our way back from DC…I started that.   I [sic] the first chair at the cops…stole their shit and used it on them!"   The same day he texted a different person saying: "We winning!   I started a riot…"   "I the[] first chair at the cops…and stole their mace from them and used it against them.   A day later, on January 7, 2021, he bragged to a third person, "It was!   I threw the first chair at the cops after they maced us.   Then we all charged them.   I got two duffel bags they left behind full of mace and tear gas, and I kept some and passed the rest out, and we got them!   They ended up taking hostages!"

Within a minute of throwing the chair at the line of officers, Schwartz joined other rioters at approximately 2:29 p.m. entering the LWT from the northwest corner as officers began to retreat from the mob.

---

[2] The government has elected to use initials to identify the officers to minimize their exposure in this public filing, although most will be readily identifiable due to their trial testimony.



*Image 2:   MPD Body Worn Camera footage shows Schwartz entering the LWT from the northwest corner at 2:29 p.m., just as rioters begin to flood the terrace*

Within minutes, Schwartz armed himself with an MPD-issued MK-46 super soaker canister filed with pepper spray.   Although he was not charged with theft, in the text messages described above Schwartz repeatedly says that he "stole" MPD chemical munitions and used it against officers.   He certainly would have had the opportunity, as multiple officers testified at trial about how they were forced to leave supplies behind as they retreated from the oncoming mob.

Between 2:30 and 2:33 p.m., Schwartz walked around the central portion of the terrace, spraying the super-soaker toward groups of retreating officers.   As Officer C.B. testified at trial, the chemical agents in the air on the terrace forced him to put on his gas mask because he "already had a hard time breathing, [after being] hit with a bunch of CS gas and chemicals."   Trial Tr. 11/30/22 at 419.   He later testified that he was sprayed with chemical agents "numerous times" that day, which required him to be "out on injury" the next day.   Trial Tr. 11/30/22 at 471.

8






*Images 3-7:   Still shots of BWC footage between 2:30-2:33 p.m. of Schwartz using the MPD-issued MK-46 against officers*

After several minutes of spraying officers with the MK-46 super-soaker, Schwartz armed himself with a new weapon, the MPD-issued MK-9 canister of pepper spray.   Ostensibly this canister was also among the "shit" Schwartz "stole" from the police.   Although smaller in size and with a shorter range, the MK-9 still contained a dangerous chemical agent that, when sprayed at the retreating officers, put them in heightened danger of harm.   At approximately 2:35 p.m., Schwartz reached out from the crowd and sprayed directly at officers huddled at the base of the stairs leading from the LWT up to the inaugural stage.   See Gov't Sentencing Ex. 2 – Video of Spray with MK-9.



*Images 8-9:   Mirror-image still shots showing Schwartz's arm extending out while holding the MK-9 canister and spraying an orange stream at the officers*

After assaulting officers on the LWT, Schwartz then made his way to the tunnel entrance in the center of the inaugural stage, entering the tunnel at approximately 3:07 p.m.   While inside, Schwartz coordinated with codefendants Markus Maly and Jeffrey Brown to spray the line of officers working to prevent the mob from breaking through the tunnel entrance and directly into the basement of the Capitol building.

Schwartz handed an unlabeled canister filled with orange liquid to codefendant Markus Maly, who was inside of the tunnel at the same time.   In turn, Maly handed the canister to codefendant Jeffrey Brown who appeared to struggle to open the canister.   Brown then handed the canister back to Schwartz, who adjusted the canister and handed it back to Brown.   Brown then made his way forward to the front of the line, ultimately spraying an orange liquid directly above the heads of the line of officers.   See Gov't Sentencing Ex. 3 – Video of Tunnel/Spray.



*Image 10:    Jeffrey Brown holding the canister provided by Schwartz and extending his arm out as he sprays above the officers in the tunnel*

While the stream of liquid did not directly hit any officer, its effect was to heighten the danger to the officers in that tunnel.   As Sergeant P.N. testified, even though he wasn't hit by that specific stream, it affected him "In one way or another."   Trial Tr. 11/30/22 at 654.   He explained that:

> Because we was [sic] in such a confined space, and you can see that the spray is aiming our direction. Also, that day, the wind was blowing in our direction, and I learned that from the outside when we were still outside before the line broke…. Because the tunnel is an enclosed space with one open end facing westward. And if the wind blow eastward, then everything that being sprayed would come back right at us.

Trial Tr. 11/30/22 at 654.

Even after assaulting this fourth group of officers, Schwartz did not back down.   He then joined the larger mob inside of the tunnel in attempting to push through the police line and into the Capitol Building.   Schwartz and the mob of other rioters attempted to use the weight of their combined bodies to push the officers back, trapping at least one officer in the process.   As Schwartz and the crowd lunged toward officers, they yelled, "Heave Ho!" and pushed against the police line. Twenty seconds later, Officer Daniel Hodges was crushed in the tunnel door as another rioter pushed a riot shield against Officer Hodges' body, rendering him unable to move.   See Gov't Sentencing Ex. 4 – Video of Tunnel Push.



*Image 11:   Schwartz participating in "heave-ho" push with the mob inside of the tunnel*

As Officer D.P. testified during trial, the chemical sprays and other assaults that he was subject to on the LWT and in the tunnel caused:

…severe burning for the following three days in my hands, in various places. And my back was -- I had severe pain in my back which I responded to the Police & Fire Clinic the next day for. …So the burning, I believe, is from when I was sprayed with various sprays in the tunnel. And my back, I believe, was from when we were pushing back and forth throughout this tunnel trying to keep them from going in. We were getting crushed between each other, the force from being applied in the front, from the back. But there really wasn't an option to let go because we couldn't afford to let them get in the tunnel.

Trial Tr. 11/30/22 at 567-68.

By Schwartz's own admission, he viewed himself as being at "war" that day, stating in a Facebook post on January 7, 2021, "What happened yesterday was the opening of a war.   I was there and whether people will acknowledge it or not we are now at war."   Even after participating in four separate assaults on officers, Schwartz was still armed and ready for "war," holding his wooden tire-knocker aloft as he exited the tunnel and ultimately the Capitol Grounds before returning to Pennsylvania.



*Image 12:   Schwartz exiting the tunnel with wooden tire-knocker in hand*

*Injuries*

Although no officer can attribute their injuries specifically to Mr. Schwartz, Schwartz's assaults with a chair and pepper spray contributed to the dangerousness of the mob and heighted the possibility of injury to each officer in his vicinity.   As the court heard at trial, each officer defending the Lower West Terrace and tunnel physically suffered in some way, including by lingering burning for days, difficulty breathing, and other physical maladies attributable to chemical irritants.

*Post-Arrest*

Following his arrest, Schwartz has shown absolutely zero remorse for his conduct and continues to cast himself as a victim.   In fact, he has given at least three interviews while incarcerated to "Cowboy Logic," a radio program hosted by Donna Fiducia and Don Neuen, including on May 22, 2022,[3] August 7, 2022,[4] and February 11, 2023.[5]   In his most recent interview in February of 2023, which took place following the trial in this case, Schwartz spent approximately 20 minutes claiming he was innocent, that the jury was biased, and that he was only prosecuted because of his political leanings.   During the interview, Schwartz claimed that he had been "incarcerated for two years for something [he] didn't do" and described the trial as "the biggest sham I've ever seen in my life."   According to Schwartz, he only picked up mace that had been "discarded" by police and "test fired" a canister.   He also claimed that he never assaulted police and his conduct was merely in defense of his wife, who was with him at the Capitol.   This

---

[3] https://rumble.com/v15qzyg-cowboy-logic-052222-peter-schwartz-jan-6-prisoner.html; Last visited April 4, 2023.
[4] https://rumble.com/v1f5nml-cowboy-logic-080722-peter-schwartz-j6-political-prisoner.html; Last visited April 4, 2023.
[5] https://rumble.com/v28uesi-cowboy-logic-021123-cowboy-logic-j6er.html; Last visited April 4, 2023.

interview makes it abundantly clear that Schwartz is absolutely convinced of his own innocence and cannot even fathom that he has done something to be remorseful for.

## III.    THE CHARGES

On February 2, 2022, a federal grand jury returned a second superseding indictment charging defendant Peter Schwartz with 11 counts;

- Three counts of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Counts 1, 3, and 4);

- One count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count 2);

- One count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon and Aiding and Abetting, in violation of 18 U.S.C. § 111(a)(1) and (b) and 2 (Count 7);

- One count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count 8);

- One count of Entering Restricted Grounds with a Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count 9);

- One count of Disorderly and Disruptive Conduct with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count 10);

- One count of Engaging in Physical Violence with a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A) (Count 11);

- One count of Disorderly Conduct in the Capitol Grounds, in violation of 40 U.S.C. § 5104€(2)(D) (Count 12); and one count of Act of Physical Violence in the Capitol Grounds, in violation of 40 U.S.C. § 5104€(2)(F) (Count 13).

The indictment also included charges related to Schwartz's codefendants, Shelly Stallings, Markus Maly, and Jeffrey Brown.   Following a trial, a jury convicted Schwartz of all counts on December 6, 2022.

## IV.   STATUTORY PENALTIES

Defendant Schwartz now faces sentencing on each of the counts listed above.   For the offenses of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b), and Obstruction of an Official Proceeding (Aiding and Abetting), 18 U.S.C. §§ 1512(c)(2), Schwartz is subject to a maximum term of 20 years of incarceration for each count, while the offense of Civil Disorder, 18 U.S.C.§ 231(a)(3), carries a maximum term of five years' incarceration.   In addition, the offenses pursuant to 18 U.S.C § 1752, including Entering Restricted Grounds, Disorderly and Disruptive Conduct, and Engaging in Physical Violence with a Dangerous Weapon, each carries a maximum term of imprisonment of 10 years.   For each of these charges, the term of supervised release is not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100 on each count.   Finally, the offenses pursuant to 18 U.S.C. § 5104, including Disorderly Conduct and Act of Physical Violence at the Capitol Grounds, each carries a maximum prison term of six months, a fine of up to § 5000, and a mandatory assessment of $10 on each count.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   Sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base

offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

Following the steps set forth in the Guidelines, the United States calculates Schwartz's Sentencing Guidelines as follows:

**Counts 1, 3, 4 & 7 : Assaulting/Resisting/Impeding Certain Officers**

| | | |
|---|---|---|
| U.S.S.G. § 2A.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A.2(b)(7) | Convicted of 18 U.S.C. 111(b) | +2 |
| U.S.S.G. § 3A1.2(a) and (b) | Assault on Police | +6 |
| | **Total for Each Count of Assaulting Officers** | **26** |

**Count 2: Civil Disorder**

| | | |
|---|---|---|
| U.S.S.G. § 2A.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(a) and (b) | Assault on Police | +6 |
| | **Total for Civil Disorder** | **24** |

17

## Count 8: Obstruction of an Official Proceeding

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[6] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[7] | +3 |
| U.S.S.G. § 3A1.2(c)(1) | Creating a risk of serious bodily injury to a law enforcement officer | +6 |
| | **Total for Obstruction** | **31** |

The United States agrees with the PSR that Counts 1, 2, 8, 9, 10, and 11 all constitute a single "group" for purposes of the sentencing guidelines. However, the United States submits that the highest offense level for this is 31, for Obstruction of an Official Proceeding, rather than 26 for Assaulting/Resisting/Impeding Certain Officers. The difference between the calculation above and the calculation in the PSR is the application of +6 pursuant to U.S.S.G. § 3A1.2(c)(1), which increases the total for Obstruction to 31. Additionally, Counts 3, 4, and 7, are all considered separate "groups" because they involve different officer victims at different locations and times, with the offense level being 26 for each group.

- Group 1 (Counts 1, 2, 8, 9, 10, and 11): The victims are officers in the northwest corner of the Lower West Terrace at approximately 2:28 p.m., to include MPD Officer D.P.

---

[6] The government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[7] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

- Group 2 (Count 3):   The victims are officers in the south-central area of the Lower West Terrace at approximately 2:30 to 2:33 p.m., to include MPD Officer C.B.

- Group 3 (Count 4):   The victims are officers at the base of the Inaugural Stage near the southern staircase on the Lower West Terrace at approximately 2:35 p.m., to include MPD Sgt. P.N.

- Group 4 (Count 7):   The victims are officers in the Lower West Terrace Tunnel between 3:07 and 3:10 p.m., to include MPD Sgt. W.B., MPD Sgt. J.M., MPD Sgt. P.N. MPD Officer D.P., MPD Officer C.B., and other known and unknown officers.

Thus, the 11 counts of conviction are placed into four individual groups as described above. Pursuant to U.S.S.G. § 3D1.4(1)(a), Group 1 is assigned a single Unit.   Pursuant to U.S.S.G. § 3D1.4(1)(b), Groups 2, 3, and 4 are each assigned an additional 0.5 Units because the base offense level is between 5-8 levels less serious than the group with the highest offense level, that being Group 1.   Finally, U.S.S.G. § 3D1.4 indicates that the total offense level should be increased by 3 where, as here, the total combined units falls between 2.5 and 3.

**Combined Adjusted Offense Level**

| | |
|---|---|
| Increase on Offense Level/Units for Group 1 | +1.0 |
| Increase on Offense Level/Units for Group 2 | +0.5 |
| Increase on Offense Level/Units for Group 3 | +0.5 |
| Increase on Offense Level/Units for Group 4 | +0.5 |
| **Total Combined Units** | **2.5** |
| **Total Adjusted Offense Level:** | **34** |

The U.S. Probation Office calculated Schwartz's criminal history score as 25, placing him in Category VI of the Sentencing Guidelines.   The United States does not dispute this calculation.

19

Accordingly, Schwartz is in a guidelines range of 262-327 months.  The United States is requesting a sentence of 294 months of incarceration, at the midpoint of Schwartz's Sentencing Guidelines range.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

Schwartz's multiple assaults on police with multiple weapons on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Schwartz's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 294 months incarceration, at the midpoint of the Sentencing Guidelines range.  Schwartz's violent participation in a "war" against the police officers protecting a lawful proceeding of Congress was dangerous and destructive and heighted the overall violence and dangerousness of the day.

Further, he has demonstrated nothing but pride for his conduct.  Following the riot, he bragged on multiple occasions about his theft of police munitions and his violence.  Even now, after being convicted following a trial, he is brazenly giving interviews from jail.  To date, he has not expressed any remorse for his actions and, instead, bragged out both his violence and his theft of law enforcement property.  He should be sentenced accordingly.

**B.  Schwartz's History and Characteristics**

Schwartz's conduct on January 6, 2021 was not at all out of character for him.   Instead, the violence he displayed that day was just the most recent episode in a three-decade history of assault, violence, and weapons.   Schwartz has a jaw-dropping criminal history of 38 prior convictions going back to 1991, several of which involved assaulting or threatening officers or other authority figures.   This astonishingly high number of convictions does not even include cases that were later dismissed, *nolle prosed* or for which Schwartz received the benefit of a deferred prosecution.

Schwartz's criminal history is listed in detail in the PSR, ¶¶ 97-158.   Of the 38 convictions detailed there, the most notable for purposes of sentencing in this case are as follows:

- 1994 conviction for Disorderly Conduct in Tazewell County, Illinois in which Schwartz "threw a lit cigarette at a victim and struck her near her eyes, and he caused damage to her apartment door."   *See* PSR ¶ 105.

- 1994 conviction for Battery in Tazewell County, Illinois for "push[ing] Peace Officer Mark Fry without legal justification…"   *See* PSR ¶ 108.

- 1995 conviction for Battery/Make Physical Contact in Tazewell County, Illinois where "Schwartz put [a] neighbor in a headlock and punched him until other neighbors broke them up."   *See* PSR ¶ 111.

- 1997 conviction for Battery in Tazewell County, Illinois for throwing his beer on a security officer after an officer told him he had to finish his beer before exiting the area. *See* PSR ¶ 113.

- 2002 conviction for Third Degree Assault, Fourth Degree Possession of a Weapon, and related charges in Bronx County, New York.   *See* PSR ¶ 119

- 2004 conviction for Assault with Deadly Weapon – Serious Injury and Larceny in Pender County, North Carolina.   *See* PSR ¶ 120.

- 2015 conviction for Felony in Possession of a Handgun and Terroristic Threatening in Owensboro, Kentucky for possessing a handgun and threatening to kill another individual.   *See* PSR ¶ 129.

- 2019 conviction for Terroristic Threats in Owensboro, Kentucky for threatening a police officers who placed him under arrest for domestic assault.   *See* PSR ¶ 132.

21

- 2019 conviction for Third Degree Convicted Felon in Possession of a Firearm and Terroristic Threatening, in Owensboro, Kentucky for possessing a handgun and also threatening to kill his girlfriend.   *See* PSR ¶ 133.
- 2020 conviction for Domestic Violence in Marysville, Ohio for assaulting his wife, Shelly Stallings, including by biting her on the forehead and punching her multiple times.   *See* PSR ¶ 134.

Put in this light, Schwartz's four separate assaults on police officers on January 6th hardly seem out of place, but was more of the same conduct after assaulting or threatening officers in 1994, 1997, and 2019.   Schwartz was on probation at the time of this offense, illustrating, if more evidence was needed, his complete and decades-long contempt for the criminal justice system. *See* PSR ¶ 136.   Schwartz has two prior convictions for possessing a handgun after being convicted of a felony.   This is significant because at the time of his arrest, law enforcement officials recovered at least one firearm from Schwartz's residence in Pennsylvania, although his wife Shelly Stallings initially claimed the firearm belonged to her.

As his criminal history makes abundantly clear, Schwartz cannot be deterred from violent conduct.   The only reliable method of protecting the community from Schwartz in the future is to remove him from the community for as long as possible.   His history counsels in favor of very lengthy sentence.

C.     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Schwartz's criminal conduct in which he assaulted four separate groups of officers using stolen canisters of police pepper spray was the epitome of disrespect for the law.   The

country cannot function if law enforcement is trampled on and assaulted when a person is simply unhappy with the laws that are being enforced.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   As described above, the prior sentences imposed on Schwartz in his three-decade criminal career, including jail time, probation, and other forms of punishment, have not deterred him from repeated violent episodes, including with the use of weapons.   The United States has no reason to believe that any sentence in this case will actually deter Schwartz from future violence once he is free from the constraints of prison. Further, even after two years, Schwartz has shown no indication that he regrets his conduct.   For this reason, Schwartz should be removed from the community for the longest period possible so as to protect the community for at least the duration of his incarceration.

---

[8]  *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

24

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Thomas Webster*, 21-cr-208, this Court sentenced the defendant after a jury trial to 120 months' incarceration. That case involved a protracted physical assault against a single officer who the defendant had picked out from the police line on the West Front. Defendant Webster was convicted of violating 18 U.S.C. §111(b), among other crimes, for using a flagpole in his assault on the officer while he defended the Capitol. Webster's guidelines range was very high because of enhancements for destroying evidence and using body armor.  In contrast to Webster, Schwartz engaged in four separate assaults on officers instead of just a single assault.  Further, Webster was a former police officer with no criminal history, in stark contrast to Schwartz's 38 prior criminal convictions.  Schwartz's sentence should reflect his greater level

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

of violence compared to Webster, as well as the long-term violent history that Webster lacked.

In *United States v. Thomas Robertson*, 21-cr-34, Judge Cooper sentenced the defendant to 87 months of incarceration following his conviction to one count of violating 18 U.S.C. § 1512(c)(2) and one count of violating 18 U.S.C. § 231(a)(3).  Leading up to January 6, Robertson advocated on social media for the use of violence to overturn the election results. He traveled to Washington, D.C. prepared for violence, having packed a gas mask, food, and a large wooden stick. While on the West Front of the Capitol, Robertson joined a crowd of rioters blocking MPD's Civil Disturbance Unit that was struggling to move through the crowd on the West Plaza where the unit planned to reinforce the Capitol Police line. Robertson stood temporarily in front of the officers, blocking their path and raising his wooden stick in "port arms." The officers had to physically move Robertson to make their way through and, when they did, he struck two officers with his stick.

Robertson then joined the mob of rioters and advanced to the Upper West Terrace and into the Capitol building. He made it into the Crypt but eventually left when ordered to do so by law enforcement. After January 6, Robertson bragged that he was proud of his conduct and destroyed his cell phone. Like defendant Robertson, Schwartz came to Washington, D.C. prepared for violence and joined the mob of rioters on the West Front and engaged with police. Like Webster and unlike Schwartz, Robertson's assaults were more limited he had no criminal history.

In *United States v. Julian Khater*, 21-cr-0222, Judge Hogan sentenced the defendant to 80 months of incarceration after he and another individual arrived in Washington, D.C. armed with two containers of bear spray, which were never used, and two containers of hand-held pepper spray, one of which Khater ultimately did use as he sprayed officers.   Khater observed the raging

27

violence occurring against police officers and he willingly and voluntarily joined that attack, spraying at least three officers at close range on the Lower West Terrace. He aimed his cannister of pepper spray towards the officers who were distracted by the group effort to remove a barricade. Khater held his right arm up high in the air and began spraying the smaller, hand-held cannister of pepper spray at any officer he could find.   Like Schwartz, Khater committed multiple assaults against officers on the LWT and joined the mob in overrunning the police.   Unlike Schwartz, however, Khater had a very minimal criminal history, limited to consuming alcohol in public in 2011, driving under the influence in 2014, and traffic infractions in 2020.   Once again, Schwartz's substantially more dangerous criminal history should be reflected in the relative sentences of these two defendants.

Finally, in *United States v. Patrick McCaughey*, 21-cr-40, Judge McFadden sentenced defendant McCaughey to a total of 90 months of incarceration for convictions for 18 U.S.C. § 111(b) and § 1512.   Specially, defendant McCaughey was convicted of multiple assaults on officers in the LWT tunnel, including for assaulting MPD Officer Daniel Hodges by crushing him with a stolen police riot shield as Officer Hodges screamed out in pain.   Like Schwartz, McCaughey was also convicted of Obstruction of an Official Proceeding for his conduct. However, McCaughey was only 23 years old at the time of the offense and had no prior criminal history whereas Schwartz has spent almost his entire adult life racking up conviction on top of conviction.   Moreover McCaughey never bragged about his actions and ultimately expressed remorse at his sentencing hearing.   Schwartz's sentence should reflect these significant differences.

## VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish

the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[11]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Schwartz to pay $2,000 in restitution for his convictions on the felony counts of the indictment. This amount fairly reflects Schwartz's role

---

[11]  Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Schwartz's convictions subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case where Schwartz apparently seeks to profit from the violence and chaos that he participated in.   According to the PSR, Schwartz "declined to sign the requisite release form authorizing the release of his financial records" which limited the ability of the PSR writer to investigate his financial situation.   *See* PSR ¶¶ 183-84.   Nonetheless, as of April 17, 2023, Schwartz has raised $71,541 in an online campaign styled as a "Patriot Pete Political Prisoner in DC" with an image of Peter Schwartz at the top.[12]   The website indicates the campaign was created by an individual named Stewart Lofton and "[t]he funds from this campaign will be received by Pete Schwartz."   There is no indication that any of the funds will be used in a specific way.   The website also includes links to the three interviews with Cowboy Logic that Schwartz

---

[12] https://www.givesendgo.com/G276B; Last visited on April 17, 2023.

has participated in while incarcerated.   Schwartz should not be able to "capitalize" on his participation in the Capitol breach in this way, nor should he be able to profit from the damage that he caused to police officers or to the Capitol grounds.   The United States notes that Schwartz has retained counsel and is not seeking to claw back funds specifically used for his legal defense.

IX.   **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of 294 months of incarceration, three years of supervised release, restitution in the amount of $2000, a fine of $71,541, and a mandatory assessment of $100 for each felony conviction and $10 for each Class B misdemeanor conviction.   This sentence is at the midpoint of Schwartz's Sentencing Guidelines range and takes account of his repeated violence against law enforcement on January 6th, his substantial violent criminal history, his utter lack of remorse, and his efforts to profit from his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:   _____/s/ Jocelyn Bond_____
Jocelyn Bond