UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-cr-178-APM |
| MARKUS MALY, | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Markus Maly to 188 months' incarceration, three years of supervised release, $2,000 in restitution, a fine of $16,011, and the mandatory $620 special assessment.

I.    INTRODUCTION

The defendant, Markus Maly, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Maly, a flooring installer from southwestern Virginia, was part of the mob of rioters that overwhelmed the police line on the Lower West Terrace (LWT) of the Capitol.   Maly picked up a canister of a chemical lachrymatory agent, possibly pepper spray, and sprayed it at Metropolitan Police Department (MPD) Officer Christopher Boyle at 2:35 p.m. as he and other officers attempted to retreat.   That attack caused very severe pain to Officer Boyle.   As the police line collapsed, officers retreated into a tunnel (LWT Tunnel) that led to an entryway into the building. An angry mob of rioters then invaded the LWT Tunnel.   At approximately 3:09 p.m., Maly entered the LWT Tunnel and made his way towards the front of the group of rioters, where he took a canister of spray from codefendant Peter Schwartz and passed it to codefendant Jeffrey Brown. Brown then used that canister of spray against the police line.   Shortly after, Maly and other rioters engaged in a coordinated push against the line of MPD and United States Capitol Police (USCP) officers.   Maly then obtained a stolen police shield that had been passed back to him by other rioters and left the LWT Tunnel with the shield as a trophy.

Maly messaged his wife and others and told them how "awesome" and "fun" it was to have participated in the attach on the Capitol.   At trial on the witness stand, Maly continued to assert that the events of January 6 were "fun" for him.   Most of his testimony, however, was riddled with lies, including his assertion that he merely displayed, and did not use, a canister of spray against Officer Boyle, and insisting that he thought he was allowed to be at the Capitol that day.

Particularly given Maly's decades-long criminal history, most of which did not generate criminal history points, the government recommends that the Court sentence Maly to 188 months' incarceration, at the top of the advisory Guidelines' range of 151 to 188 months, which the

2

government submits is the correct Guidelines calculation.   A 188-month sentence reflects the severe gravity of Maly's conduct, his complete lack of any acceptance of responsibility, his fraudulent attempts to profit off his notoriety, his obstruction of justice at trial, and a significant criminal history spanning his entire adult life.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

Paragraphs 19 through 25 of the presentence report (PSR) succinctly describe the violent assault on the United States Capitol building that took place on January 6, 2021, when many hundreds of rioters unlawfully broke into that building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Maly's Role in the January 6, 2021 Attack on the Capitol

#### *Maly's Entry onto the Capitol Grounds*

Markus Maly lives in Fincastle, Virginia.   On the morning of January 6, 2021, Maly traveled from his home to Washington, D.C. via bus.   Maly testified that he traveled to Washington by himself, and that he went to attend the "Stop the Steal" rally.   After hearing the President's speech, Maly walked down the National Mall to the Capitol.

Around 2:30 p.m., Maly was part of a very large group that had gathered on the Lower West Terrace.   As the line of police collapsed and retreated towards a stairwell, Maly could be

seen in the crowd pushing forward:



**Figure 1:** *Screenshot of Government's Trial Exhibit 121 at 0:34 with Maly Circled*

Maly then donned a cowboy-style hat and went up the north side of a small set of stairs

on the LWT while holding what appear to be two cannisters:



**Figure 2:** *Screenshot of Government's Trial Exhibit 121 at 1:54 with Maly Circled*

As the police retreated into the southeast corner of the LWT near a stairwell, Maly threw

an item up in the air in the direction of the police:[2]

---

[2] This additional conduct was only recently discovered by the government following trial, and in anticipation of sentencing.



**Figure 3:** *Screenshot of Government's Trial Exhibit 121 at 2:18 with Maly and the Item Circled*

### *Maly's Assault of Officer Boyle*

Maly continued to push forward with other rioters against the line of retreating officers.

At 2:35 p.m., Maly was standing near other rioters as they sprayed officers with a chemical

lachrymatory agent as those officers tried to protect the grounds and buildings from rioters.

Maly continued to carry one of the canisters in his right hand as seen below:



**Figure 4:** *Screenshot of Government's Exhibit 117.1 at 1:19 with Maly Circled*

Maly then stepped forward in the crowd and sprayed MPD Officer Christopher Boyle

with the contents of the canister.   Officer Boyle's Body Worn Camera (BWC) captured the

moment that Maly sprayed him:



**Figure 5:** *Government's Trial Exhibit 106A.28*

At trial, Officer Boyle testified that when he was sprayed by Maly, it "hurt immediately"

and was consistent with Officer Boyle's prior experience and training with oleoresin capsicum

(OC) spray.[3]   Officer Boyle further stated that, when Maly sprayed him, he felt pain on a 9 or 10

out of 10 on the pain scale.[4]   FBI Special Agent Shawn Cox later testified at trial that the

canister was consistent with a "Fox" pepper spray canister, and that Fox is a manufacturer of

---

[3]  Trial Transcript at 451. "Pepper spray and tear gas spray are both non-lethal irritants commonly used in self-defense and crowd control. While some people use the terms interchangeably, it is important to note that tear gas and pepper spray are not the same product, and each has its own unique chemical distinctions." https://www.aftermath.com/content/tear-gas-vs-pepper-spray/#:~:text=The%20two%20biggest%20differences%20between,comes%20from%20man%2 Dmade%20compounds (last visited April 5, 2023. "The active ingredient in pepper spray is Oleoresin Capsicum (OC). OC is not a man-made chemical, it is created from the active compound in hot peppers, capsaicin." *Id*.
[4]  Trial Transcript at 460.

chemical pepper spray.[5]   A search of Fox's website shows the company advertising a canister

remarkably similar to the one Maly used to spray Officer Boyle:



**Figure 6:** *Image from* https://foxlabs.com/products/32fts *(last accessed April 3, 2023)*

Fox's "Five Point Three" line of OC spray contains 2% OC, and advertises as being, "one

of the only true police strength pepper sprays on the market."[6]   At trial, MPD Sargent William

Bogner testified that, on January 6, 2021, the strongest OC spray possessed by the MPD was 1.3

percent concentrated OC.[7]

### Maly's Conduct Inside the Tunnel

After assaulting Officer Boyle, Maly climbed scaffolding leading to the Inauguration

Stage, where he recorded a selfie-style video declaring, "I really wish I could've recorded what I

just, what we just fucking did.   This is the Capitol building.   This what happens when you steal

---

[5] Trial Transcript at 1013-1014.
[6] *See* https://foxlabs.com/products/32fts (last accessed April 3, 2023).
[7] Trial Transcript at 721-722.

elections.   You get a pissed off fucking America.   And American knows how to fight back."[8]

Maly then made his way towards the LWT tunnel, where the police were taking refuge following their retreat.   At 3:09 p.m., Maly entered the tunnel with his co-defendants Peter Schwartz and Jeffrey Brown.   Shortly thereafter, Schwartz passed a canister to Maly.   Maly looked at the canister, and then passed it to Brown at 3:10:52 p.m.



**Figure 7:** *Screenshot of Government's Trial Exhibit 103.7 at 2:12 with Maly in White Box*

Brown then sprayed the orange substance, consistent with OC spray, at the line of officers guarding the LWT tunnel.[9]

After Brown sprayed the line of officers, Maly remained in the tunnel and was one of many rioters to push against the police line, coordinating their thrust by yelling "heave ho" in

---

[8]  Government's Trial Exhibit 302.
[9]  *See* Trial Transcript at 757-758; Government's Trial Exhibit 103.9.

unison.   A few minutes later, Maly took a police riot shield that had been passed back to him. At 3:15 p.m., Maly left the tunnel with the shield.

### *Maly's Pre-Arrest Statements*

In the aftermath of January 6, Maly made numerous statements via social media discussing how "fun" and "awesome" his experience was.   On the evening of January 6, Maly sent a Facebook message to his wife telling her "we took the fuckin capital (sic)…" and "it was awesome."[10]   In another exchange on January 6, he reiterated that "I[t] was so fun…"[11]   The following day, he sent another message to a Facebook user describing what he did at the Capitol:

---

[10] Government's Trial Exhibit 303.3.
[11] Government's Trial Exhibit 303.4.

> **Author** Mark Maly (Facebook: 100006627407496)
> **Sent** 2021-01-07 15:06:46 UTC
> **Body** Daniel, I want to tell you that I was in D.C. for the event yesterday
> as well. I was looking for you but couldn't find you in the sea of
> people.
>   Anyway, I ended up going to the capital building after Trumps
> speech as well. On my way there I was finally able to get some
> phone signal and was able to get an update on what was going on
> with our V.P.. Buy the time I got to the capital I was pissed. The
> crowd had already made it passed the barricades and were up in
> the rafters of the scaffolding. I made my way up to where the
> action was and saw the cops being backed into the corner and
> retreating into the capital building via a side door. There was tear
> gas, pepper spray and mace being used as you would imagine in
> that situation. At that point I was actually close enough to be
> yelling 'let them retreat' to people engaged with them. But don't
> get me wrong. I was pissed off. I am a pissed off American, God
> loving Trump supporter. I went to D.C. to help my President as a
>
> 2020-1-7                                    **(16)**

> patriot as I think many did. At what point do we stop standing
> around texting how mad we are and do something? Antifa was
> definitely there but not as themselves or else things might have
> been different. The reason it was able to go down the way it did
> was simple. We the people are pissed. So now what...?
>
> 2021-1-7

**Figure 8:** *Government's Trial Exhibit 303.6*

A week later, on January 12, 2021, Maly told a third individual that his time at the Capitol building "was fun."[12]

### Maly's Post-Arrest Statements and Perjury at Trial

Maly was interviewed by the FBI on January 28, 2022, following his arrest.   Maly stated that he made arrangements the night before January 6 to travel to Washington, D.C. via bus.

---

[12] Government's Trial Exhibit 303.7.

When shown a photograph of him spraying Officer Boyle, Maly smiled and stated, "I should probably lawyer up," but then kept talking.

Maly stated that the police were "being assholes" and spraying people with pepper spray.[13]   He told the agents that he picked up a canister or two of pepper spray and then sprayed them at police officers.   Maly admitted going into the LWT tunnel and that people were "heaving" against a wall of police, which is when he decided to leave.   Maly admitted to obtaining a police riot shield with the word "Metropolitan" written on it and stated that he intended on taking the riot shield home with him as a "trophy."   Maly stated that a police officer confiscated the shield as he was carrying it back to his bus.

Maly testified at trial, and made numerous materially false statements, including the following:

- Maly stated that he did not spray any police officers, but merely "displayed" the canister to an officer (Boyle).   According to Maly, officers purposely left the pepper spray behind in order to set him and other rioters up to commit crimes.[14] This testimony was contradicted by Officer Boyle's testimony that Maly sprayed him with a chemical that was consistent with OC spray.[15]

- Maly testified that he did not see any signs or anything else putting him on notice that he was prohibited from going to the Capitol.[16]   This testimony was belied by Maly's Facebook message to his wife on January 7, in which he stated that by the time he arrived at the Capitol, "The crowd had already made it passed [sic] the barricades and were up in the rafters of the scaffolding.   I made my way to where the action was and saw the cops being backed into the corner and retreating into the capital [sic] building via a side door. There was tear gas, pepper spray and mace being used as you would imagine in that situation."

---

[13] *See* Trial Testimony of FBI Special Agent Shawn Cox, Trial Transcript at 936.
[14] Trial Transcript at 1027-1028, 1070.
[15] Trial Transcript at 439-441.
[16] Trial Transcript at 1020.

- Maly testified that he never pointed a canister of pepper spray at police officers.[17]   This testimony was contradicted by Officer Boyle's testimony and BWC footage that Maly sprayed him with a chemical that was consistent with OC spray.[18]

- Maly testified that he merely showed an Officer Boyle the canister that Maly picked up. This testimony was belied by Officer Boyle's testimony that Maly sprayed him with a chemical.[19]

- Maly further claimed that he yelled at Officer Boyle, "You're setting us up, you fuckin' assholes. Stop setting us up."[20]   This testimony was contradicted by the video evidence from Officer Boyle's BWC that showed Maly did not yell anything and instead sprayed Officer Boyle with a substance consistent with OC spray.[21]

- Maly testified that he was not trying to spray anyone.   On cross-examination, when confronted with a video recording that clearly showed him spraying Officer Boyle (Exhibit 106A at 14:35:48), Maly claimed that the stream of liquid coming out of the canister was actually a piece of fringe on his hat.   However, his hat didn't have a fringe;[22]

- Maly testified that he thought he was allowed to be at the Capitol, despite a line of police preventing him from entering the building;[23]

- Maly testified that he assumed the item he passed to Schwartz in the tunnel was "some form of help for somebody" like a water bottle, and not a canister of pepper spray.[24] However, the video evidence played at trial clearly showed Maly taking the canister from codefendant Schwartz, looking at it, and then passing it to codefendant Brown.[25]

- Maly testified that he did not cross a police line or attempt to push past a police line, and he further testified that he thought he was permitted to be on Capitol grounds and inside the Capitol.   Maly continued to assert this defense even though he was present in the tunnel on the Lower West Terrace and participated in an assault on police.[26]

---

[17] Trial Transcript at 1024.
[18] Trial Transcript at 439-441.
[19] *Id*.
[20] Trial Transcript at 1027.
[21] *See* Government's Trial Exhibit 106A at 41:30-42:12 (2:35:12-2:35:53 p.m.).
[22] Trial Transcript at 1070-1071.
[23] Trial Transcript at 1085.
[24] Trial Transcript at 1079.
[25] *See* Government's Trial Exhibit 103.7 at 2:00-2:20.
[26] Trial Transcript at 1098.

On cross examination, Maly admitted that on January 6, he was fighting back against what he believed to be a stolen election.[27]   He confirmed that he told the FBI agents he wanted to take the riot shield home as a "trophy," and would have displayed it in his home to commemorate what he did that day.[28]

Maly admitted to being proud of what he had done at the Capitol and that he had bragged about it.[29]   Despite seeing police officers assaulted, injured, and distressed on January 6, and knowing that it was a bad day for members of Congress and the police officers who had to live through the riot, Maly reiterated that his experience that day was "fun."[30]   He confirmed that the only reason he left the Capitol was to catch his bus.[31]

Following his conviction at trial, Maly was remanded to custody.   Soon thereafter, Maly's wife set up a donation page through the website Give Send Go.[32]   Maly wrote a statement about his conviction which was posted to the website to solicit money.   In his statement, Maly claimed the FBI pointed numerous rifles at his 6-year-old son when they came to arrest him, and that his "head & face were covered in their red dots."   He pleaded for people to send his family money and asked his "Fellow Americans & Patriots" for support.

More recently, Maly also gave a statement that was published in an article on the internet.[33]   In the article, Maly stated that he was a "January 6th P.O.W." and described how a

---

[27] Trial Transcript at 1085.
[28] Trial Transcript at 1088-1089.
[29] *Id*.
[30] Trial Transcript at 1092-1096.
[31] Trial Transcript at 1093.
[32] Available at https://www.givesendgo.com/G9QRD (last accessed April 17, 2023).
[33] https://www.thegatewaypundit.com/2023/03/are-you-lost-dad-jan-6-dad-speaks-for-first-time-

jury found him guilty "regardless of the facts that were presented to them in trial."   He

referenced his Give Send Go account and again begged for donations.   In the days following the

posting of Maly's statement via the website, and as of April 17, 2023, Maly has raised $16,011

through his Give Send Go donation page.   *See* PSR ¶ 156.

### III.     THE CHARGES AND GUILY VERDICTS

On December 6, 2022, following a week-long trial, a jury returned a verdict of guilty on

all eight counts against Markus Maly charged in the Second Superseding Indictment:

- Count Two, Interfering with Police During a Civil Disorder, 18 U.S.C. § 231(a)(3);

- Count Five, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 USC §§ 111(a)(1) and (b);

- Count Seven, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 USC §§ 111(a)(1) and (b);

- Count Nine, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- Count Ten, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- Count Eleven, Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- Count Twelve, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

- Count Thirteen, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

---

since-jury-slaughter-in-dc-kangaroo-court-and-prison-surrender-please-help-markus-maly-and-his-family/ (Last accessed April 17, 2023).

## IV.    STATUTORY PENALTIES

Maly now faces sentencing on those charges.   The U.S. Probation Office has correctly noted the statutory penalties for each.   PSR ¶¶ 161-168.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.   *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

With the exception of the failure of the PSR to include a Guidelines analysis for each count of conviction, as required by U.S.S.G. §§ 1B1.1(a)(1)-(3), the Guidelines calculations in the Final PSR (ECF No. 197) are correct.[34]   The U.S. Probation Office calculated Maly's criminal history as category V, which is not disputed. PSR ¶ 109.   Accordingly, based on a total offense level of 30 and a criminal history category V, Maly's guideline imprisonment range is 151 to 188 months' imprisonment.

---

[34] Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. Despite the PSR's failure to follow these steps, the PSR's grouping analysis and guideline imprisonment range is correct.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

The nature and circumstances of Maly's crimes weigh heavily towards a significant term of incarceration.   Maly personally participated in multiple acts of violence on the West Front and inside the LWT tunnel on January 6.   He picked up a canister of pepper spray and used it against a police officer, after seeing police officers overwhelmed by the rioters and attempting to retreat.

After that, Maly make his way into the tunnel, where he helped another rioter pepper spray multiple police officers by passing him a canister.   He pushed against officers guarding the tunnel. And then he obtained a stolen police shield and attempted to take it home with him as his trophy commemorating his conduct at the Capitol.

Maly's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to engage in violence.   After the riot, he glorified the assault on Congress, disregarded the injuries and trauma suffered by police officers defending the Capitol, and minimized his conduct.   Maly then obstructed justice by committing perjury at trial, has shown absolutely no remorse for his actions, and has attempted to profit off his notoriety for his own financial benefit.

18

Even by the standards of January 6 defendants, the nature and circumstances of Maly's crimes are appalling.

### B. Maly's History and Characteristics

Simply put, Markus Maly is a lifelong criminal, with a felonious history dating back three decades. Not including the eight convictions for the instant offenses, Maly has a total of 33 convictions, including four for burglary and *nine* for either battery or aggravated battery, including two for battery of a law enforcement officer:[35]

- 1993: **Possession of a Controlled Substance**, 20 days jail and 24 months' probation
- 1996: **Aggravated Battery**, 60 days jail and 2 years' probation (later revoked to 13 months' imprisonment)
- 1996: **Battery of Law Enforcement Officer**, 2 years' probation (later revoked to 13 month's imprisonment)
- 1996: **Failure to Appear**, 2 years' probation (later revoked to 13 month's imprisonment)
- 1996: **Battery,** 2 years' probation (later revoked to 13 month's imprisonment)
- 1997: **Battery / Trespass**, 108 days' jail
- 1997: **Burglary**, 4 month's jail
- 2000: **Battery**, 12 months' probation (later amended to 45 day's jail for violations)
- 2000: **Battery**, 12 months' probation (later revoked to 45 days' jail)
- 2004: **Burglary**, 5 years' imprisonment (sentenced as a habitual offender)
- 2004: **Felony Battery**, 5 years' imprisonment (sentenced as a habitual offender)
- 2004: **Battery of a Law Enforcement Officer**, 5 years' imprisonment (sentenced as a habitual offender)
- 2004: **Driving While License Suspended or Revoked (Felony)**, 5 years' imprisonment
- 2012: **Withholding Information from a Practitioner**, 21 months' and 2 days' imprisonment
- 2012: **Burglary**, 21 months' and 2 days' imprisonment
- 2012: **Burglary**, 21 months' and 2 days' imprisonment
- 2014: **Battery**, 37 days' jail 2017: **Contempt of Court**, 10 days' jail (suspended)
- 2017: **Contempt of Court**, 20 days' jail with 10 days suspended

PSR ¶¶ 84-108. Notably, 25 of Maly's 33 convictions, including six of his battery convictions,

---

[35] Maly sustained an additional 14 convictions for less serious offenses. *See* PSR ¶¶ 84-108.

have no impact on his criminal history score.   *See id.*

Maly's crimes on January 6, especially his assaults on police officers, were not some isolated events in an otherwise law-abiding life.   They came, instead, after a lifetime of violent conduct and a complete disrespect for the law.   Maly's history and characteristics, including his history of arrest and conviction for violent assaults, weigh heavily in favor of a significant sentence.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[36] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Maly's criminal conduct, assaulting one police officer, helping to assault other officers, and attempting to take a police shield as his personal trophy, is the epitome of disrespect for the law.   Despite his lies on the witness stand, it was abundantly clear to Maly that the police officers protecting the building were under siege.   Police officers were overwhelmed, outnumbered, and in some cases, in serious danger, and Maly told this Court that, to him, it was fun.   A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously.   In this way, a lesser

---

[36] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                                                          at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[37] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Maly also weighs heavily in favor of a lengthy term of incarceration.   Maly has had multiple opportunities to express even a semblance of remorse or contrition and has refused to do so.   Beyond his failure to accept any responsibility, Maly committed perjury at his trial.

Markus Maly is a recidivist criminal who has never learned his lessons.   Time and again from the beginning of his adulthood, he has exhibited a propensity to reengage in criminal behavior.   January 6 was not an aberration: it was practically standard fare.   Other, prior significant sentences, including sentences for assaulting law enforcement officials, have not deterred him.   A significant sentence to deter Maly from future crimes is warranted, particularly in light of his history of assaultive and deceptive conduct.

---

[37] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[38]

---

[38] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[39]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Webster*, 21-cr-208, this court sentenced the defendant after a jury trial to 120 months' incarceration.   Webster was convicted of violating 18 U.S.C. §111(b), among other crimes, for using a flagpole during a protracted physical assault against a single officer on the West Front of the Capitol.  Like Maly, Webster also engaged in obstruction of justice, but his guideline range also included an enhancement for possession of body armor. Webster was also a former police officer and military veteran with no criminal history, unlike

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[39] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Maly's 33 prior criminal convictions.   Maly's sentence should reflect his repeated assaults on multiple law enforcement officers and his consistent, repeated history of violence.

In *United States v. Thomas Robertson*, 21-cr-34, Judge Cooper sentenced the defendant to 87 months' incarceration following his conviction to one count of violating 18 U.S.C. § 1512(c)(2) and one count of violating 18 U.S.C. § 231(a)(3).   In the leadup to January 6, Robertson, then a police officer, used social media to advocate for the use of violence to overturn the election results. He traveled to D.C. prepared for violence, having packed a gas mask, food, and a large wooden stick.   On the West Front of the Capitol, Robertson was part of a group of rioters who prevented MPD's Civil Disturbance Unit from reinforcing the Capitol Police line.   As officers attempted to move Robertson, he struck two officers with his stick.   Robertson entered the Capitol through the Upper West Terrace and made it into the Crypt before being ejected from the building.

Like Robertson, Maly joined rioters engaging with the police and committed an assault. Both Robertson and Maly also engaged in obstruction of justice: Robertson got rid of his phone and deleted his social media account, while Maly committed perjury on the witness stand.   Unlike Maly, Robertson physically attacked only a single police officer, while Maly engaged in multiple attacks against many officers.   Importantly, like Webster, Robertson had no criminal history, in stark contrast to Maly's consistent recidivism.

Lastly, *United States v. Albuquerque Head*, 21-cr-291, involved one of the few January 6 defendants in a similar criminal history category as Maly.   Head was convicted of dragging Metropolitan Police Department Officer Michael Fanone out of the LWT Tunnel into a mob of violent rioters where he was viciously assaulted.   Head repeatedly struck towards the police line

with a riot shield, wrapped his arm around Officer Fanone's neck, and forcibly dragged Officer Fanone into the riotous mob, isolating him as the crowd violently assaulted the officer.   Head was sentenced by Judge Jackson to 90 months' incarceration.   However, Head was convicted under 18 U.S.C. 111(a)(1), unlike Maly, who was convicted of multiple assaults using a deadly or dangerous weapon.   More importantly, Head plead guilty and received acceptance of responsibility.   Maly not only elected to proceed to trial, but also engaged in obstruction of justice. Maly's complete lack of any acceptance of responsibility should be reflected in his sentence.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under

the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA)

Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[40]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount

---

[40] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Maly to pay $2000 in restitution for his convictions on the six felony counts.   This amount fairly reflects Maly's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Maly's convictions under 18 U.S.C. Sections 231, 111, and 1752 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3).   Maly's convictions under 40 U.S.C. Section 5104 subject him to a maximum fine of $5,000.   *See* 18 U.S.C. § 3571(b)(6).   In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d).   In assessing a defendant's income and earning capacity, a sentencing court properly

considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the revised PSR notes, and looking most recently at his Give Send Go page, Maly has raised over $16,000 in an online campaign crated by his wife. PSR ¶ 156 The request for donations, purportedly written by Maly, references his convictions on charges as a "January 6 P.O.W." and asks for money for his family.   Maly has been appropriately given the benefit of an able public defender, and has no legal fees associated with his case.   He should not be able to use his own notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 188 months' incarceration, three years of supervised release, $2,000 in restitution, a fine of $16,011, and the mandatory $620 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    _____
Stephen J. Rancourt
Assistant United States Attorney, Detailee
Texas Bar No, 24079181
601 D Street, N.W.
Washington, D.C. 20530
(806) 472-7398
stephen.rancourt@usdoj.gov

29